UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case No.: 3:16 CV 1179-J-39 JBT

**CHRISTIAN TESTA,** as Personal
Representative of the Estate of **Paul Testa**,
Deceased,

Plaintiff,

v.

**THE CITY OF JACKSONVILLE,**
**E.L. HAYNES**, individually and in his official capacity,
official capacity, **J.M. RHODEN**, individually and in his official
capacity, **F.D. CALHOUN**, individually and in his official
capacity, **G. BRIDGEMAN**, individually and in his official capacity,
 **T.P. TAYLOR**, individually and in his official capacity,
**J.A. SIRVENT**, individually  and in his official capacity,
**C.S. WINTERS**, individually and in his official capacity,
**J.L. BUCHANAN**, individually and in his official capacity, and
**C.A.NORTON**, individually and in his official capacity.

Defendants.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff, **CHRISTIAN TESTA** as Personal Representative of the Estate of **Paul Testa**,

his natural father, by and through the undersigned counsel, files this complaint against all

Defendants and alleges:

## INTRODUCTION

1.  This is an action for damages arising out of the death of Paul Testa, on December 26,

    2015. CHRISTIAN TESTA, as the Personal Representative of the Estate of Paul Testa,

1

his natural father, brings this action on behalf of all potential beneficiaries and survivors of Paul Testa, and on behalf of the Estate, for damages as provided in 42 U.S.C. § 1983, the Florida Wrongful Death Statute, and other applicable state and federal law.

2. This is a civil action brought pursuant to 42 U.S.C. §§ 1983, 1988, and the laws of the state of Florida, for injury resulting in death, contributed to by excessive physical force. This action arises from an incident occurring on December 21, 2015, at the John E. Goode Pre-trial Detention Center in Jacksonville, Florida. Paul Testa, while in the custody and control of the Defendants, was shot multiple times with a taser, subjected to unlawful detention, unlawful restraint, and excessive force, which caused him injuries, eventually resulting in his death. Plaintiff seeks damages against the governmental Defendant and individual Defendants for committing acts under Color of State Law which deprived the decedent of his Federal Constitutional Civil Rights. Plaintiff also invokes the court's jurisdiction pursuant to 28 U.S.C. § 1367, over State of Florida Common Law and statutory claims.

3. Plaintiff has complied with the notice provisions of all relevant Florida Statutes and municipal ordinances prior to the filing of this lawsuit. On January 14, 2016, Plaintiff served on Defendant THE CITY OF JACKSONVILLE, the notice required by Florida Statutes § 768.28, and the Jacksonville Municipal Ordinances. More than six (6) months have elapsed since this notice was provided.

## JURISDICTION AND VENUE

4. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and arises under the United States Constitution and the laws of the State of Florida.  This court has jurisdiction pursuant to 28 U.S.C. sections 1331, 1333, and 1367.

5. This cause of action arose out of acts and omissions occurring in Jacksonville, Duval County, Florida. Therefore, venue is proper in this Court.

## THE PARTIES

6. CHRISTIAN TESTA is a resident of Jacksonville, Duval County, Florida, is the natural son of Paul Testa, deceased, and is the Personal Representative of Paul Testa's Estate. CHRISTIAN TESTA was born in 1997.

7. Decedent Paul Testa was a resident of Jacksonville, Duval County, Florida. His death occurred in Jacksonville, Duval County, Florida. At the time of his death, Paul Testa was forty-four (44) years old.

8. Pursuant to the Florida Wrongful Death Act, the only known statutory survivor of Paul Testa is Christian Testa.

9. THE CITY OF JACKSONVILLE is a political sub-division of the State of Florida and, as such, is an entity organized and existing under the laws of the state of Florida.  THE CITY OF JACKSONVILLE has, among its other functions, operating and maintaining a law enforcement department known as the Jacksonville Sheriff's Office, which in turn operates and maintains a department of corrections and the John E. Goode Pre-trial Detention Facility ("The jail") in Jacksonville, Duval County, Florida.

10. THE CITY OF JACKSONVILLE established or delegated to the Jacksonville Sheriff's Office the responsibility for establishing and implementing the policies, procedures, practices, uses and customs utilized by law enforcement officers in the jail in Jacksonville, Duval County, Florida, including those governing use of force, restraint, and taser devices.

11. THE CITY OF JACKSONVILLE has a duty to operate and maintain its law enforcement operations, including the jail, so as to preserve the rights, privileges, and amenities guaranteed to its citizens under the Constitution and laws of the United States and the State of Florida.

12. Defendant E.L. Haynes ("HAYNES") was at all times material an adult resident of Jacksonville, Duval County, Florida and was employed at the jail as a correctional officer with the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE.

13. Defendant J.M. Rhoden ("RHODEN") was at all times material an adult resident of Jacksonville, Duval County, Florida and was employed at the jail as a correctional officer with the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE.

14. Defendant F.D. Calhoun ("CALHOUN") was at all times material an adult resident of Jacksonville, Duval County, Florida and was employed at the jail as a correctional officer with the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE.

15. Defendant G.C. Bridgeman ("BRIDGEMAN") was at all times material an adult resident of Jacksonville, Duval County, Florida and was employed at the jail as a correctional officer with the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE.

16. Defendant T.P. Taylor ("TAYLOR") was at all times material an adult resident of Jacksonville, Duval County, Florida and was employed at the jail as a correctional officer with the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE.

17. Defendant J.A. Sirvent ("SIRVENT") was at all times material an adult resident of Jacksonville, Duval County, Florida and was employed at the jail as a correctional officer with the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE.

18. Defendant C.S. Winters ("WINTERS") was at all times material an adult resident of Jacksonville, Duval County, Florida and was employed at the jail as a correctional officer with the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE.

19. Defendant J.L. Buchanan ("BUCHANAN") was at all times material an adult resident of Jacksonville, Duval County, Florida and was employed at the jail as a correctional officer with the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE.

20. Defendant C.A. Norton ("NORTON") was at all times material an adult resident of Jacksonville, Duval County, Florida and was employed at the jail as a correctional officer with the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE.

21. The individual Defendants listed above are all sued in their individual and official capacities as employees of the Duval County Corrections Division of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE acting in the course and scope of their employment.

## FACTUAL BASIS FOR CLAIM

22. On or about December 21, 2015, Paul Testa was arrested by officers of the Jacksonville Sheriff's Office and charged with Trespass on Property and Criminal Mischief ($200.00 or less). At the time of his arrest, and immediately prior thereto, Paul Testa was behaving

5

in an unusual fashion which indicated he suffered from mental distress or illness. He had been observed by a neighbor standing inside their fence and holding onto their gate and acting strangely. The police were called. When officers arrived, they found Paul Testa at his home. He showed signs of confusion and disorientation. He appeared, to the officers, to be "on drugs."  He told them that he had wanted to see his father but admitted to them that his father had passed away some years before.

23. Paul Testa was taken into custody and transported to the jail and booked into custody. During his transportation, and during the booking process, Testa exhibited no disruptive or dangerous behavior, either to himself or to others.

24.  After being booked, Paul Testa was sent to the medical wing of the jail for clearance and evaluation. Melissa Peterson, an employee and/or agent of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, interviewed and examined Paul Testa at approximately 5:47 AM.  She weighed him and recorded his weight as 149 pounds.  His vital signs were normal.  Paul Testa was cooperative throughout this process.  Despite the fact that Paul Testa had been observed repeatedly talking to his dead father, exhibiting signs of mental confusion, and had been observed by officers as appearing to "be on drugs", Nurse Peterson determined that he had no signs of altered mental status or any significant medical conditions, and recommended him for placement in the general population on the 2nd floor of the jail.

25. At approximately 7:00 AM, corrections officers responded to a disturbance on the 2nd floor involving Paul Testa.  Paul Testa had been observed screaming and yelling and this was found to be disturbing the other inmates.   At this time, corrections officer W.H. Long confronted Paul Testa and performed a "drive stun" or "dry tase" on him.   This

occurs when a taser is held against an individual's skin and discharged without firing of the device's projectiles.  After tasing him, Officer Long administered a knee spike to Paul Testa's side, immobilizing him.

26. Tasers, also referred to as stun guns, are hand-held devices that use compressed gas to fire electrodes that deliver an initial shock of 50,000 volts of electricity, rendering the victim temporarily incapacitated.  The Taser X-26 was the model used by Officer Long and other officers in the jail.

27. Taser International, the manufacturer of the taser X-26, has issued a warning against repeated and prolonged use of "drive stuns" on individuals with mental health conditions. Taser has also issued product warnings to law enforcement that "repeated, prolonged or continuous" use "may contribute to cumulative exhaustion, stress, cardiac, physiologic, metabolic, respiratory and associated medical risks which could increase the risk of death or serious injury."

28. The Jacksonville Sherriff's Office knew, or should have known, based on the above described warnings and other literature concerning the taser X-26, that they should avoid prolonged, extended, discharges or extensive multiple charges in order to minimize the potential for over-exertion of the subject or potential impairment of the cardiac and respiratory function over time, particularly when dealing with individuals with mental health conditions.

29.  Officer Long's taser was subsequently found to be malfunctioning in that it did not record any data of its usage on Paul Testa.  This is a normal function of the device and allows those reviewing the data to determine the precise time the taser was deployed, the number of times it was deployed, and for how long.  The taser was also found to be

discharging such large amounts of voltage that Officer Long felt a shock in his hand, causing him to drop the weapon. Officer Long's taser was subsequently taken out of service due to these defects.

30. After being tased, Paul Testa was escorted to the medical wing of the jail where he was examined by James Feagle acting in the course and scope of employment and/or agency with the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE. Paul Testa's vital signs were reported as within normal limits, although they were not numerically recorded. He was noted to have scratches to his face and arms. There is no description of a physical examination being performed or whether anything was done to determine if the "drive stun" he had received had caused any physical or cardiac injury.

31. At that time, a mental health screening was also performed by Linda Lattimer, a Licensed Mental Health Counselor ("LMHC"). She observed Paul Testa shaking his head and wailing, as well as singing to himself. He stated that he heard his father's voice and that he was raised by "the angels in heaven." He reported a history of being involuntarily placed in a mental health facility, and that he was diagnosed as schizophrenic, but denied taking medications. During this evaluation, Paul Testa was cooperative. Linda Lattimer, acting in the course and scope of employment and/or agency with the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE diagnosed Paul Testa as having unspecified schizophrenia and other psychotic disorder(s), and recommended that he be placed in the mental health lock down unit. Paul Testa was then taken to the 6th Floor of the Jail and placed alone in a cell.

32. Paul Testa did, in fact, suffer from schizophrenia, a chronic mental illness that affects how a person thinks, feels, and behaves and whose sufferers may appear like they have

8

lost touch with reality.  It is believed that Paul Testa's condition may have been aggravated at the time of this incident by the anniversary of the death of his mother.  Paul Testa, nonetheless, was a functioning member of society who, prior to this incident, had never been arrested, who was fully employed, and who had raised a child, Chirstian Testa, and was putting him through college at the University of North Florida at the time of his death.

33. At approximately 2:59 PM Paul Testa appeared before the Honorable Lester Bass, Judge of the County Court, in the courtroom adjacent to the jail.  He was found to have no prior arrest record. All charges against him were dismissed.  The Judge signed an Ex Parte Order pursuant to Section 394, Florida Statutes, also known as the Baker Act, requiring Paul Testa to be transported to a designated mental health-receiving facility for an involuntary examination. Paul Testa replied that this was "OK." The Order signed by Judge Bass directed that Paul Testa be taken to the Mental Health Resource Center (MHRC) on Beach Boulevard, in Jacksonville, Florida, "as soon as possible."

34. Section 394.495 of the Baker Act, provides that "It is the policy of this state that the individual dignity of the patient shall be respected at all times and upon all occasions, including any occasion when the patient is taken into custody, held, or transported. Procedures, facilities, vehicles, and restraining devices utilized for criminals or those accused of crime shall not be used in connection with persons who have a mental illness, except for the protection of the patient or others. Persons who have a mental illness but who are not charged with a criminal offense shall not be detained or incarcerated in the jails of this state."

35. As of the moment Judge Bass dismissed all charges against him and entered his ex parte order for involuntary examination pursuant to the Baker Act, Paul Testa ceased to be a pre-trial detainee and became a patient entitled to the protections enumerated in Section 394.495 of the Baker Act.  At this time, he was not charged with any crime.  Pursuant to the Baker Act he could not be held in the jail nor could he be subject to any restraints used in the jail except to the extent he was determined to be a threat to himself or others.

36. After leaving the courtroom, Paul Testa was picked up by Defendant Winters. WINTERS, and the other individual defendants, knew or should have known that Paul Testa had been referred for an involuntary mental health evaluation pursuant to the Baker Act and that Testa had been tased earlier that day.  When he was picked up, Testa was described as passive and subdued.  At this time, Testa was in a four-point restraint with his legs and arms shackled together.   WINTERS led Testa to the elevators and told him he was taking him back to his cell on the 6th floor of the jail.  Testa, knowing he was supposed to be taken out of the jail to the MHRC for evaluation, pulled away from the officer and backed away from the elevator, stating that he was supposed to go for an evaluation.

37. WINTERS then forcefully threw Paul Testa down to the floor and forcefully restrained him, Assisted by Officer R.W. SMITH.  At this time, Testa was lying on the floor, not demonstrating any physical resistance, only passive resistance, i.e. laying on the floor and refusing to stand up, and was requesting to see the doctor for his evaluation. WINTERS, and Officer Smith then forcefully lifted him up and carried him to the elevators to take him back to his jail cell on the 6th floor in violation of the provisions of the Baker Act outlined above and in violation of Judge Bass's Ex Parte Order.

38. Upon arrival on the 6th floor, Paul Testa backed away from the door opening, again stating that he was supposed to see a doctor for an evaluation.   Paul Testa was then forcefully thrown to the floor.  Despite being in four-point shackles and being held down by four correctional officers, it was alleged that the 149 pound Testa, in a fit of "super strength" grabbed for WINTERS taser (although he never gained control of it). The four (4) officers then continued to forcefully restrain Testa again, despite the fact that he was demonstrating only passive resistance.

39. Paul Testa was lifted off the ground and forcefully carried him to his cell.   Testa repeatedly asked to see a doctor for evaluation.  Testa was placed on his bunk and his four-point restraints were removed.   At this point, Testa tried to flee from the cell. WINTERS and HAYNES, then forcefully pushed Testa back into his cell and restrained him.  WINTERS repeatedly struck Testa in the arms in order to force him to comply with their commands.  BRIDGEMAN arrived on the scene and discharged his taser at Testa. Both projectiles engaged in Testa's lower back and he was stunned.   BRIDGEMAN nonetheless performed two (2) additional  "drive stuns" on Testa, making it a total of three (3) times he was tased in a matter of seconds and at least four (4) times that day. The five (5) officers then placed Testa back in his four-point restraint shackles.

40. After Testa was placed in the four-point restraints, the decision was made by HAYNES to place him in a restraint chair.   The chair was brought to Testa's cell and the defendants, collectively, began to attempt to place him in the chair. A "signal 34" call, or, "officer needs assistance" call was put out over the radio system.   Numerous officers arrived on the scene including officers TAYLOR, BUCHANAN, CALHOUN, SIRVENT, RHODEN, and multiple others.  The number of officers who surrounded Paul

Testa and forcefully secured him to the restraint chair was described by witnesses as between 8 or 9 at the least and up to as many as 20.  The officers were described as a "crowd" and a "swarm".

41. During the process of forcefully placing the already shackled Testa into the restraint chair, tremendous and clearly excessive force was used.  The sheer number of officers pushing and pulling on Testa's body was excessive.  The individual defendants forcefully pushed his back forward towards his knees while pulling on his arms and forcefully pushing his head toward his chest.  Multiple attempts were made to hit "pressure points" by driving elbows into Testa's back and shoulders and by manipulating his thumb away from his hand.  This event was described as lasting approximately fifteen (15) minutes.  During this process Testa was heard to say that he could not breathe and that he was in pain.  He was observed to be breathing heavily by witnesses and was heard screaming as the weight of the sixteen (16) individual defendants was pressed down upon his back, shoulders, head, and neck, crushing them down upon his legs.

42. During this 15 minute process, Testa's four point restraint shackles were removed and he was strapped to the chair.  At some point thereafter someone noticed that Testa was not moving and "did not look right."   An officer asked if he was breathing.  CALHOUN checked for a pulse and could not find one.  A Captain ordered that Testa be removed from the restraint chair.  Despite the fact that they knew he had no pulse and was not breathing, the officers took the time to reattach the four point restraint shackles before attempting to assist Testa. At that time, it was noticed that Testa had voided his bladder.  He was rolled over onto his side.  A "signal 17" call or call for "medical help" was made over the radio.

43. When medical personnel arrived, Paul Testa was found lying in front of the cell on his right side. He was unresponsive. No one was rendering aid to him in the form of CPR. A corrections officer stated that he had been involved in a fight with an officer, and was tased while he was either in a restraint chair, or being placed in one. CPR was begun. A defibrillator device was employed. Chest compressions were started.  Rescue was called.

44. Rescue personnel from the Jacksonville Fire and Rescue Department made contact with Paul Testa at 3:47 PM. Jail staff told them that Paul Testa became combative with officers, and while officers were restraining him, he had become unresponsive. He had no pulse and his skin was cyanotic to the head, neck and upper extremities, meaning that he had gone a significant amount of time without breathing. Resuscitation efforts commenced and, at 4:02 PM, a pulse returned. Paul Testa was then transported to Shands Jacksonville Hospital.

45. At the hospital, Paul Testa was found to have suffered cardiac arrest following taser injury. He was found to have pulseless electric activity and anoxic encephalopathy. While in the hospital, employees and/or agents of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE restrained him to the bed with handcuffs despite the fact that they had been told he was essentially "brain dead."  Armed officers were stationed at his door.  He never regained consciousness, and on December 26, 2015, Paul Testa was taken off of life support. He was declared dead at 11:04 PM.

46. Almost immediately following this incident, the Jacksonville Sheriff's Office and the individual defendants engaged in efforts to frustrate discovery of the truth concerning Paul Testa's death.  Many, If not all, of the individual defendants who were present during the events of December 21, 2015, met with the same police organization attorney

within a short time of the events and prior to giving statements to investigators. Their statements, therefore, contained remarkably similar phrases and observations, such as use of the terms "excited delirium" and "super-human strength" and statements that they did not see any officer "choke, strike or do harm" to Testa.

47. Immediately following the incident of December 21, 2015, a Jacksonville Sheriff's Officer, Detective Meachem, began an investigation into the incident. That night, Detective Meachem presented to Shands Jacksonville Hospital. He asked a nurse caring for Paul Testa to view toxicology results for testing done upon Testa. The nurse refused, stating that they specifically were prohibited from releasing such information. Detective Meachem asked to speak to the nursing supervisor. The supervisor also stated that the hospital could not release the toxicology results. Detective Meachem then told the nursing supervisor that he suspected Testa had been using drugs and that such drug use may have explained his "erratic" behavior at the jail. He further told the supervisor that Testa could only have obtained the drugs from other prisoners as contraband while in the jail and that it was "time sensitive" that the Jacksonville Sheriff's Office determine if this was the case.

48. Detective Meachem's statements were patently false as he knew that Testa had been placed in isolation on the 6th floor since approximately 7:00 AM that morning and that, prior to being placed in isolation, he had undergone a mental and physical evaluation that revealed no indications he was on drugs.

49. In light of these statements from Detective Meachem, the hospital staff provided Testa's toxicology results. The toxicology results showed no evidence of any drugs, legal or illegal, in Paul Testa's system which are known to cause erratic or dangerous behavior or

the phenomenon known as "excited delirium".  Only trace amounts of THC, a chemical found in marijuana, were found in Testa's system.

50. The Taser used to "drive stun" was not secured by Detective Meachem for a full day after this incident.   It was later tested and found to be "malfunctioning" in that the data recording function was not working. This prevents any determination from being made as to how many times the taser was used on Paul Testa, the precise time of the use on Paul Testa, and the duration of the use.

51. On multiple occasions after the incident of December 21, 2015, representatives of Christian Testa made requests to view video taken of Paul Testa while at the jail.  Such video was documented to exist by Detective Meachem.  These requests were made pursuant to the Freedom of Information Act and Public Records Law.  The Jacksonville Sheriff's Office refused all requests.

52. On multiple occasions after the incident of December 21, 2015, representatives of Christian Testa made requests for reports of the Jacksonville Sheriff's Office investigation to determine what had occurred to Paul Testa and to identify individuals who may have witnessed the incident.  These requests were made pursuant to the Freedom of Information Act and Public Records Law.  The Jacksonville Sheriff's Office refused all requests.

53. An autopsy was performed by the Duval County Medical Examiner's Office on December 29, 2015.  The autopsy found that Paul Testa had suffered a sudden change in heart rhythm followed by cardiac arrest and subsequent anoxic encephalopathy. Toxicology results confirmed that no drugs, legal or illegal, were in Paul Testa's system

which are known to cause erratic or dangerous behavior or the phenomenon known as "excited delirium".    No official cause of death was listed.

54. On multiple occasions after the incident of December 21, 2015, representatives of Christian Testa requested the autopsy report from the Medical Examiners Officer.  These requests were made pursuant to the Freedom of Information Act and Public Records Law. The Medical Examiner's Office replied that the Jacksonville Sheriff's Office would not allow them to release the autopsy.

55. On March 23, 2016, Detective Meachem requested a meeting with the medical examiner's office.  He described in detail Paul Testa's "behavior" and "demeanor" in the hours before the incident of December 21, 2015. On March 29, 2016 the medical examiner issued a report listing the cause of death for Paul Testa as "excited delirium syndrome".

56. "Excited delirium" is not a legitimate medical diagnosis.  It is not recognized by the American Medical Association.  It is not recognized by the Diagnostic and Statistical Manual of Mental Disorders.  It is recognized, however, by medical examiners and law enforcement agencies and almost exclusively used in cases of severe injury or death caused by excessive force while in police custody.

57. The Jacksonville Sheriff's Office investigation into the death of Paul Testa was marked by a concerted event to engineer an "excessive delirium" defense.  These efforts included coordinated witness statements by the individual defendants which utilized "buzzwords" and phrases such as "super human strength" and "excited delirium" as well as improper and unlawful access of Paul Testa's medical information and, finally, direct influencing of the Medical Examiner's determination of the cause of death.

58. The Jacksonville Sheriff's Office investigation into the death of Paul Testa was marked by a concerted event to delay the release of information concerning the incident and the autopsy of Paul Testa so as to frustrate attempts to bring an action against the defendants who are all affiliated with the Jacksonville Sheriff's Office.  These delays prevented the plaintiff from obtaining crucial information such as the identity of witnesses who may no longer be available.

**COUNT I UNDER 42 U.S.C. § 1983- DEPRIVATION OF CIVIL RIGHTS AGAINST DEFENDANTS E.L. HAYNES, J.M. RHODEN, F.D. CALHOUN, G.C. BRIDGEMAN, T.P. TAYLOR,  J.A. SIRVENT, C.S. WINTERS, J.L. BUCHANAN AND C.A.NORTON**

59. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-58 herein.

60. The above described actions (as stated in the Factual Basis of Claim paragraphs above, 22-58) subjected Paul Testa to a deprivation of rights and privileges secured to him by the Constitution and laws of the United States within the meaning of 42 U.S.C. § 1983. Stated with more particularity, the above described actions violated Paul Testa's Fourth, Fifth, and Fourteenth Amendment rights and privileges.

61. The physical force, detention, restraint, and repeated tasering of Paul Testa by Defendants E.L.HAYNES, J.M. RHODEN, F.D. CALHOUN, G.C. BRIDGEMAN, T.P. J.A. SIRVENT, C.S. WINTERS, J.L. BUCHANAN, C.A.NORTON, were reckless, malicious, and with deliberate indifference, such that they were entirely unjustified under the circumstances of this incident, and constituted an unreasonable and excessive use of force and unlawful detention.

62.   The above described actions involving Paul Testa were taken individually and jointly by employees and/or agents of the Jacksonville Sheriff's Office and THE CITY OF

JACKSONVILLE under Color of State Law. The laws pertaining to freedom from the use of excessive and unreasonable force were clearly defined, established and well settled at the time of the actions taken by the defendants.

63. The actions of HAYNES, RHODEN, CALHOUN, BRIDGEMAN, TAYLOR, SIRVENT, BUCHANAN and NORTON were objectively unreasonable under the circumstances based on the perspective of a reasonable officer.  No reasonable officer could deem it necessary to repeatedly taser, physically strike, and employ the force exerted by up to 20 law enforcement officers to restrain in a chair a non-violent individual facing no criminal charges who had immediately prior thereto been subject to an Ex Parte Judicial Order for a Baker Act evaluation at a mental health facility.

64. As a direct and proximate result of the acts and omissions of HAYNES, RHODEN, CALHOUN, BRIDGEMAN, TAYLOR, SIRVENT, BUCHANAN and NORTON, Paul Testa was deprived of rights afforded him under the United States Constitution, including but not limited to the Fourth, Fifth, and Fourteenth Amendments, and the laws of the State of Florida including but not limited to the Baker Act.

65. As a direct and proximate result of the acts and omissions of the Defendants, the Estate of Paul Testa has incurred medical and funeral expense, loss of earnings, and loss of prospective net accumulations.

66. As a direct and proximate result of the acts and omissions of the defendants, the survivors of Paul Testa have lost his support and services and have sustained mental pain and suffering. These losses are continuing and nature and will occur in the future.

67. Plaintiff, CHRISTIAN TESTA, is entitled to payment of his reasonable attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988.

**WHEREFORE**, Plaintiff, CHRISTIAN TESTA, prays for entry of judgment against the individual Defendants, E.L. HAYNES, J.M. RHODEN, F.D. CALHOUN, G.C. BRIDGEMAN, T.P. TAYLOR, J.A. SIRVENT, C.S. WINTERS, J.L. BUCHANAN, AND C.A. NORTON for damages as allowed under 42 U.S.C. § 1983 and other applicable State and Federal law, together with attorney's fees, costs, and interests and demands a Trial by Jury on all issues.

## COUNT II UNDER 42 U.S.C. § 1983- DEPRIVATION OF CIVIL RIGHTS AGAINST THE CITY OF JACKSONVILLE

68. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-67 herein.

69. The above described actions (as stated in the Factual Basis of Claim paragraphs above, 22-58) subjected Paul Testa to a deprivation of rights and privileges secured to him by the Constitution and laws of the United States within the meaning of 42 U.S.C. § 1983. Stated with more particularity, the above described actions violated Paul Testa's Fourth, Fifth, and Fourteenth Amendment rights and privileges.

70. The physical force, restraint and repeated tasering of Paul Testa by employees and/or agents of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE were reckless, malicious, and with deliberate indifference, such that they were entirely unjustified under the circumstances of this incident, and constituted an unreasonable and excessive use of force.

71. The above described actions involving Paul Testa were taken by employees and/or agents of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE under Color of State Law. The laws pertaining to freedom from the use of excessive and unreasonable

force were clearly defined, established and well settled at the time of the actions taken by the defendants.

72. The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, by and through its agents agency in their official capacity, acting under color of law, failed to adequately supervise, train and manage the employees and/or agents working for the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE at the jail, thereby causing foreseeable deprivation of Paul Testa's Constitutional rights.

73. The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, failed to establish a policy as to the proper use of the tasers and restraint chairs in use as of December 21, 2015, contrary to established police procedures and accreditation requirements, and failed to establish policies, procedures, customs, and/or failed to implement policies, procedures, and customs related to the use of tasers and restraint chairs on mentally-ill. Such failures constitute deliberate or reckless indifference to safety, thereby causing the foreseeable deprivation of Paul Testa's Constitutional rights.

74. The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, failed to establish a policy as to the proper use of force as it relates to patients subject to Ex Parte Order for involuntary mental health evaluation pursuant to the Baker Act as of December 21, 2015, contrary to established police procedures and accreditation requirements. Further, these defendants failed to establish policies, procedures, customs, and/or failed to implement policies, procedures, and customs related to the acceptable use of force, including use of tasers and restraint chairs on patients subject to Ex Parte Order for involuntary mental health evaluation pursuant to the Baker Act. Such failures constitute

deliberate or reckless indifference to safety, thereby causing the foreseeable deprivation of Paul Testa's Constitutional rights.

75. The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, failed to adequately investigate complaints of previous incidents of unjustified, unreasonable, and illegal use of force by employees/and or agents at the jail, thereby causing its employees and/or agents to believe such conduct was permissible, and thereby causing the foreseeable deprivation of Paul Testa's Constitutional rights.

76. The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, permitted, encouraged, tolerated and/or ratified a pattern and practice of unjustified, unreasonable, and illegal use of force by employees/and or agents at the jail, in that the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE failed to take adequate corrective action to discipline or prosecute known instances of wrongful and excessive use of force by its officers, thereby causing the foreseeable deprivation of Paul Testa's Constitutional rights.

77. The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, failed to establish a system to review complaints of excessive use of force, by employees/and or agents at the jail, which would adequately and appropriately identify those employees and/or agents who use excessive force, and failed to properly and appropriately discipline, supervise, and/ or re-train such employees and/or agents, to the extent that it has become the de facto policy, procedure, and custom, to tolerate the use of excessive force by its employees and/or agents, thereby causing foreseeable deprivation of Paul Testa's Constitutional rights.

78. The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, knew, or should have known in the exercise of reasonable care, of actual or potential dangers and risk of injury with respect to excessive and unreasonable use of force, involving deployment of taser weapons on mentally ill subjects, and failed to correct or prevent them, thereby causing foreseeable deprivation of Paul Testa's Constitutional rights.

79. The acts and omissions of The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, constitute unlawful police or detention facility practices.

80. As a direct and proximate result of the acts and omissions of the Defendants, the five-foot-nine (5' 9"), one hundred and forty-five pound (145 lb.), Paul Testa was subjected to enormous physical force from multiple employees of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, along with multiple tasings, that caused or contributed to cause his cardiac arrest, and ultimately his death.

81. As a direct and proximate result of the acts and omission of The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE OFFICE, Paul Testa was deprived of rights afforded him under the United States Constitution, including but not limited to the Fourth, Fifth, and Fourteenth Amendments, and the laws of the State of Florida including but not limited to the Baker Act.

82. As a direct and proximate result of the acts and omissions of The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE OFFICE, the Estate of Paul Testa has incurred medical and funeral expense, loss of earnings, and loss of prospective net accumulations.

83. As a direct and proximate result of the acts and omissions of The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE OFFICE, the Estate of Paul Testa has

incurred medical and funeral expense, loss of earnings, and loss of prospective net accumulations.

84. As a direct and proximate result of the acts and omissions of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE OFFICE, the survivors of Paul Testa have lost his support and services and have sustained mental pain and suffering. These losses are continuing and nature and will occur in the future.

85. Plaintiff, CHRISTIAN TESTA, is entitled to payment of his reasonable attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988.

**WHEREFORE**, Plaintiff, CHRISTIAN TESTA, prays for entry of judgment against and THE CITY OF JACKSONVILLE, for damages as allowed under 42 U.S.C. § 1983, and other applicable State and Federal law, together with attorney's fees, costs, and interests and demands a Trial by Jury on all issues.

<u>**COUNT III**</u>
<u>**ALTERNATIVE CLAIM AGAINST THE CITY OF JACKSONVILLE  FOR**</u>
<u>**WRONGFUL DEATH UNDER STATE LAW**</u>

86. Plaintiff re-alleges and incorporates herein the allegations of paragraphs 1-85 herein.

87. In the alternative, Plaintiff is entitled to relief against THE CITY OF JACKSONVILLE under the Florida Wrongful Death Act.

88. At all times material, the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE owed a duty to inmates in the jail, including Paul Testa, to provide non-negligent care and correctional services to those in its custody and control and to avoid exposing them to unreasonable risks of injury, harm, or death.

89. At all times material, the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE owed a duty to patients who were subject to an Ex Parte Order for involuntary examination pursuant to the Baker Act, including Paul Testa, to comply with the Ex Parte Order by providing him transportation, as soon as possible, to the designated mental health facility in a safe fashion so as to avoid exposing him to unreasonable risks of injury, harm or death, and without placing him in jail or using restraints reserved for criminal detainees.

90. The Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE breached its duty of care to Paul Testa in one or more of the following respects:

   a. Failing to establish and implement reasonable and appropriate policies and procedures in place at the jail governing the use of force, including the use of restraint chairs and tasers, against inmates, particularly those with mental illnesses and those subject to ex parte orders for involuntary examination pursuant to the Baker Act;

   b. Failing to ensure that its employees and/or agents at the jail followed and adhered to existing policies and procedures governing the use of force, including the use of restraint chairs and tasers, against inmates, particularly those with mental illnesses and those subject to ex parte orders for involuntary examination pursuant to the Baker Act;

   c. Failing to establish and implement reasonable and appropriate policies and procedures in place at the jail for the evaluation, identification, treatment, placement, housing, and control of inmates with mental illnesses and those subject to ex parte orders for involuntary examination pursuant to the Baker Act;

in such a way as to protect them from unreasonable risk of injury, harm, or death;

d. Failing to establish and implement adequate training, instructing, and supervision of its employees and/or agents with regard to the appropriate interaction with inmates suffering from mental illnesses and those subject to ex parte orders for involuntary examination pursuant to the Baker Act;

e. Placing Paul Testa in the general jail population at the jail when, it should reasonably have been known to its employees and/or agents that, he was suffering from mental illness and was not suited for such placement;

f. Placing Paul Testa in jail by transporting him to the 6th floor after Judge Bass entered an Ex Parte Order for involuntary examination pursuant to the Baker Act rather than taking him to the designated receiving facility, the Mental Health Resource Center on Beach Boulevard in Jacksonville, Florida as ordered; and

g. Failing to take Paul Testa to his court ordered mental health evaluation at the Mental Health Resource Center in a timely and appropriate fashion; Failing to provide Paul Testa appropriate medical care and treatment in a timely fashion.

91. As a direct and proximate result of the negligence of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE as alleged herein, Paul Testa was subjected to enormous physical force from the employees of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE, along with multiple tasings, that caused or contributed to cause his cardiac arrest, and ultimately his death.

92. As a direct and proximate result of the negligence of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE and the death of Paul Testa as alleged

herein, the Estate of Paul Testa has incurred funeral and medical expenses, and suffered loss of earnings and loss of prospective net accumulations.

93. As a direct and proximate result of the negligence of the Jacksonville Sheriff's Office and THE CITY OF JACKSONVILLE and the death of Paul Testa as alleged herein, the survivors of Paul Testa, namely CHRISTIAN TESTA, suffered the loss of his comfort, companionship, society and services, and has incurred mental pain and suffering. These losses are continuing in nature and he will reasonably experience them in the future.

**WHEREFORE**, Plaintiff, CHRISTIAN TESTA, prays for entry of judgment against THE CITY OF JACKSONVILLE, for damages as allowed under the Florida Wrongful Death Statute, and other applicable State and Federal law, together with attorney's fees, costs, and interests and demands a Trial by Jury on all issues.

## DEMAND FOR JURY TRIAL

Plaintiff, CHRISTIAN TESTA, hereby demands a trial by jury as to all issues. **Signed this 18th day of September, 2017.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of September, 2017, I electronically filed the foregoing with the Clerk of the Court for using the CM/ECF system.  I further certify that I served a copy of the foregoing by electronic mail to:  Defendant's counsel, OFFICE OF GENERAL COUNSEL: GABRIELLA YOUNG, ASSISTANT GENERAL COUNSEL and STEPHEN J. POWELL, CHIEF OF TORT & EMPLOYMENT, Office of General Counsel 117 West Duval Street, Suite 480, Jacksonville, Florida 32202, SPowell@coj.net;

GCYoung@coj.net, and further certify that I mailed and served the foregoing documents and the

notice of electronic filing by first-class mail and by Marshall/Appointed Process Server to the

following non-CM/ECF participants as follows:

**E.L. HAYNES**,
**J.M. RHODEN**
**F.D. CALHOUN**,
**G. BRIDGEMAN**,
**T.P. TAYLOR**,
**J.A. SIRVENT**,
**C.S. WINTERS**,
**J.L. BUCHANAN**,
**C.A.NORTON**,
c/o Chief T.S. Morris
Jacksonville Sheriff's Office – Pretrial Detention
500 East Adams Street
Jacksonville, Florida 32202

NICHOLS & PINA, LLLP


BY:/s/ THEODORE S. PINA
THEODORE S. PINA, JR.
FL Bar No.: 0095192
300 West Adams Street, Suite 130
Jacksonville, Florida 32202
(904) 353-3300 (P) (904) 353-3315 (F)
Attorney for Plaintiff
ted@nicholsandpina.com
kerry@nicholsandpina.com